Timothy L. BARTON, Individually and d/b/a JMJ International, JMJ Development, Inc., and JMJ Biltmore, LLC, Appellants/Cross–Appellees,

v.

SCLAFANI INVESTMENTS, INC., Appellee/Cross–Appellant.

No. 05–08–00790–CV.

Court of Appeals of Texas, Dallas.

July 28, 2010.

Rehearing Overruled Sept. 22, 2010.

Mitchell Madden, Thomas V. Murto, III, Madden Sewell, LLP, Dallas, TX, for Appellants/Cross–Appellees.

Timothy D. Zeiger, Shackelford, Melton & McKinley, Robert F. Kemp, Dallas, TX, for Appellee/Cross–Appellant.

Before Justices MARTIN RICHTER, LANG–MIERS, and MURPHY.

## OPINION

Opinion By Justice MURPHY.

This appeal presents questions regarding the validity of a contract for real estate brokerage commissions under Tennessee law. Timothy L. Barton, individually and d/b/a JMJ International, JMJ Development, Inc., and JMJ Biltmore, LLC (collectively, the JMJ entities) appeal the judgment rendered on a jury's verdict in favor of Sclafani Investments, Inc. for commissions claimed under a contract for purchase and sale of property known as the "Biltmore PUD" located near Nashville, Tennessee. We conclude the contract to pay Sclafani Investments a brokerage commission was not supported by legal consideration, and the trial court therefore erred in failing to grant appellants' motion for judgment notwithstanding the verdict. We reverse the trial court's judgment and render judgment that Sclafani Investments take nothing on its claims.

## BACKGROUND

Sclafani Investments is a real estate brokerage corporation, licensed in Texas. Its president and principal broker is Salvatore Sclafani, who is also licensed in Texas. According to Salvatore, a broker's job is "to identify and be a procuring cause of the sale." Barton is a real estate developer and Texas-licensed real estate agent.

As a real estate developer, Barton finds property to be developed, evaluates the potential risks and rewards for developing that property, locates investors for the property, coordinates financing, and then executes the actual development of the property. JMJ Development, Inc. is one of Barton's property development companies. JMJ International and JMJ Biltmore, LLC are entities Barton either established or planned to establish.

## Barton's Relationship with Salvatore Sclafani

Barton and Salvatore have known each other for many years. In early 2004, Barton invited Salvatore to share office space with him. The arrangement was not exclusive and did not preclude Salvatore from developing or maintaining other broker business while using Barton's office space rent free. In addition to sharing office space, Barton and Salvatore had an agent-broker relationship arising out of the Texas law, which requires a real estate agent to be sponsored by a Texas real estate broker. Barton affiliated his real estate agent's license with Sclafani Investments's broker's license.

## The Nashville Deal

The property at issue in the lawsuit is a 2000 square-acre of land located near Nashville, Tennessee. The property, referred to by the parties as the "Biltmore PUD,"[1] was owned by Cecil D. Branstetter and the Branstetter Family Partners. The Branstetters were represented by Southeast Venture, LLC, a real estate services company.

In January 2004, Edward Brooks, a Tennessee-licensed commercial real estate broker with Crye–Leike Realty, contacted Barton about the Biltmore PUD. Brooks met with Barton at a coffee shop in Texas, where Brooks gave Barton information about the property, including a map and outline of the location, total acreage, and existing permits. Barton described the property as "a big piece of land on a major intersection in a growing market." Barton thought the opportunity "sound[ed] like a good deal." On January 25, 2004, Barton signed a "Buyer Registration" agreement with Brooks, in which Barton acknowledged Crye–Leike and Brooks as his "Broker of Record."

In March 2004, Barton had a second meeting with Brooks concerning the Biltmore PUD; Salvatore attended this meeting. At the meeting, Brooks presented Barton and Salvatore with a package related to the Biltmore PUD. The package consisted of a large roll of drawings that showed the topography of the land, as well as the dimensions of the property and a layout of a prior PUD. Following the meeting, Barton directed Salvatore to draft a letter of intent to show Barton's interest in purchasing the property. On March 15, 2004, Salvatore sent the letter of intent to the Branstetter family. The letter of intent referenced a proposed six-percent commission split among the seller's and buyer's brokers, including Sclafani Investments. Barton proposed the seller pay the total commission. At that time, neither Salvatore nor Sclafani Investments had an agreement with Barton to receive a commission for brokerage services related to the property.

### The May 2004 Purchase & Sale Agreement

Thereafter, a contract for the purchase and sale of the Biltmore PUD was negoti-

---

1. "PUD" stands for "planned unit development." One witness, Edward Brooks, described a "planned unit development" as "a formal term in real estate that has to do with the layout, the planning, the traffic, the amount of construction that could be done on a piece of property" and approved by a governmental authority.

ated and signed. Signatories were Cecil Branstetter, individually and on behalf of the seller; Barton, on behalf of JMJ International,[2] the buyer; Salvatore, on behalf of Sclafani Investments; and Brooks as representative of Crye–Leike. The effective date of the Purchase and Sale Agreement was May 21, 2004 (the Agreement).

Paragraph 14 of the Agreement called for a seven-percent commission split among the seller's and buyer's brokers and provided:

> At closing Seller shall pay a brokerage commission equal to six percent (6%) of the Purchase Price, Buyer shall pay a brokerage commission equal to one percent (1%) of the Purchase Price for a total of seven percent (7%) commission which shall be divided as follows: two percent (2%) to Crye–Leike Realty or other broker of record having Ed Brooks representing Buyer; two percent (2%) to Sclafani Investments, Inc. having Sal Sclafani also representing Buyer; and three percent (3%) to Southeast Venture, LLC representing Seller. In the event this sale fails to close for any reason, no commission shall be paid or owed.

The Agreement also prescribed Tennessee law.

### Salvatore's Due Diligence

After the Agreement was signed, Salvatore prepared a feasibility study so Barton could evaluate the purchase. For the study, Salvatore conducted due diligence in Tennessee, where he met with the author of the PUD, reviewed twenty-five years' worth of research from city records, and visited with the utility companies, water and taxation authorities, planning department, and prospective purchasers for development of portions of the tract. Salvatore also performed work on the project in Dallas, where he "set up and arranged meetings for bond financing so that the funds could be made available for development of the infrastructure...." He worked with Barton's finance manager to prepare a promotional brochure. One component was preparation of a financial plan to attract investors. According to Salvatore, he performed the feasibility study and other due diligence as Chief Operating Officer (COO) of JMJ Development, rather than as broker.

### Events Leading Up to the Lawsuit

In late 2004, Salvatore's relationship with Barton soured. According to Salvatore, Barton stopped communicating with him for a period of six to eight weeks. Based on the lack of communication, Salvatore eventually left the office he shared with Barton and performed no additional work on the Biltmore PUD. In January 2005, Barton changed his agent affiliation from Sclafani Investments to Mark Adams, another Texas-licensed broker.

In March 2005, Barton sent Salvatore a letter informing Salvatore he was removing Sclafani Investments from the Agreement as a payee of any commission. Barton explained: "JMJ arranged for you to participate in the commission on the transaction ... based on your representations as to your development experience" and with the expectation that "you would perform due diligence work that would be needed on the property." Barton acknowledged that providing Salvatore "with a

---

2. JMJ International was the company Barton intended to form as a separate company associated with the Biltmore PUD. According to Barton, JMJ International was to be the buying company and the company in which investors would invest in the project. JMJ International, however, was never formed. Instead, Barton formed JMJ Biltmore, LLC as the company to purchase and own the Biltmore PUD.

portion of the commission was a way to compensate [Salvatore] for this work." Barton expressed that Salvatore "did not perform the needed tasks as necessary," and after many delays during the due diligence phase, he "had to bring in additional staff to handle the project." Barton stated that these and other circumstances "led [him] to remove [Salvatore] from the project...." In response, Salvatore defended his due diligence work and maintained his input and recommendation influenced Barton to move forward with an offer to purchase the Biltmore PUD. Salvatore further asserted he was "the procuring cause of this venture" and wrote that he expected to be paid his commission at closing as outlined in the Agreement.

Shortly thereafter, on April 13, 2005, the Agreement was amended. This was the second amendment; the first amendment, in November 2004, extended the time frame in which Barton paid his fourth earnest money deposit. Pursuant to the second amendment, JMJ International assigned its interest to JMJ Biltmore, LLC, and JMJ Biltmore assumed JMJ International's obligations under the Agreement.[3] In addition, the Branstetter family accepted a $7,000,000 promissory note secured by the first deed of trust encumbering the property as a part of the purchase price. The commission paragraph was also modified by substituting Adams as the buyer's representative instead of Sclafani Investments. Under the modified commission paragraph, Adams was to receive the two-percent commission for representing the buyer. Salvatore was notified of the amendment and did not agree to the change in the commission paragraph.

The purchase and sale closed on May 25, 2005. Nashville Biltmore acquired the property for $9,500,000. As result of the second amendment, Adams received $190,000, the two-percent broker's commission. At Barton's direction, a portion of that commission–$165,000–was paid to JMJ Development; Adams kept the remainder.

### The Lawsuit

Just weeks after the second amendment was signed, Sclafani Investments filed suit on April 27, 2005 against Barton, individually and d/b/a JMJ International; Cecil Branstetter, individually and d/b/a Branstetter Family Partnership; Crye–Leike; and Southeast Venture, alleging claims for breach of the Agreement and quantum meruit. Sclafani Investments also sought declaratory relief, asking the court to determine and declare Sclafani Investments's entitlement to the $190,000 commission. In its amended pleadings, Sclafani Investments dropped its claims against the Branstetters and Southeast Ventures, and added claims against JMJ Development, JMJ Biltmore, and Adams. Sclafani Investments settled its claims with Crye–Leike and Adams before trial.

In its fourth amended petition, which was the live pleading at the time of trial, Sclafani Investments alleged causes of action against Barton and the JMJ entities for breach of the Agreement, breach of an employment contract, fraud, civil conspiracy, money had and received, an accounting, constructive trust, and quantum meruit. It also sought declaratory relief and attorneys' fees. The trial court granted summary judgment against Sclafani In-

---

**3.** On May 24, 2005, the day before the deal closed, JMJ Biltmore, LLC assigned the Agreement to Nashville Biltmore, L.P. JMJ Biltmore was Nashville Biltmore's general partner; Barton signed the assignment as the managing member of JMJ Biltmore. Nashville Biltmore assumed JMJ Biltmore's duties and obligations under the Agreement. Nashville Biltmore is not a party to this appeal.

vestments on its constructive trust, civil conspiracy, and accounting claims.

Barton, individually and d/b/a JMJ Development, asserted counterclaims against Sclafani Investments for breach of contract, negligent misrepresentation, and tortious interference with a contract. Barton also alleged third-party claims against Sclafani Investments, Salvatore, and Robert Kemp, Sclafani Investments's trial counsel, for invasion of privacy, negligence, negligence per se, aiding and abetting, and conspiracy. Barton also sought attorneys' fees. Barton's claims against the third-party defendants related to the use of Barton's personal information at his deposition in this case. The trial court struck the third-party claims without prejudice pursuant to an agreed order.[4] The trial court also directed a verdict against Barton and JMJ Development on their counterclaims.

The case was tried to a jury for four days. After Sclafani Investments rested, Barton and the JMJ entities moved for a directed verdict on all claims against them. The trial court directed a verdict against Sclafani Investments on its claims for breach of an employment contract, fraud, and quantum meruit. The trial court also directed a verdict on Sclafani Investments's claim for money had and received against Barton and JMJ Biltmore, denying the motion for directed verdict as to JMJ Development. The remainder of the case was submitted to the jury, which returned a verdict in favor of Sclafani Investments on its claims for breach of the Agreement, money had and received (against JMJ Development), and attorneys' fees. Specifically, the jury found (1) Barton's agreement for Sclafani Investments to receive a commission as set forth in paragraph 14 of the Agreement was supported by sufficient consideration; (2) Barton's and JMJ Biltmore's failure to comply with the commission provision was not excused; (3) Sclafani Investments's failure to comply with the Agreement was excused; (4) Sclafani Investments's damages resulting from Barton's or JMJ Biltmore's failure to comply with the Agreement were $190,000; and (5) the money received by JMJ Development from Adams out of money Adams received from the Biltmore PUD closing belonged in equity and good conscience to Sclafani Investments.

Thereafter, Sclafani Investments filed a motion for judgment, and Barton and the JMJ entities filed a motion for judgment notwithstanding the verdict. Barton and the JMJ entities argued, among other things, they were entitled to a take-nothing judgment because there was no evidence Sclafani Investments provided consideration to support the broker's fee provision in the purchase and sale Agreement. The trial court granted Sclafani Investments's motion and rendered judgment on the jury's verdict, awarding breach of contract damages of $305,481.75, including pre-judgment interest and attorneys' fees, against Barton and JMJ Biltmore, jointly and severally, plus $172,027.89 for the money had and received claim against JMJ Development. The trial court also ordered that Barton, JMJ Biltmore, and JMJ Development each receive dollar-for-dollar credits for payments made by any other defendant or Adams as a settling person. Both parties appealed.

Barton and the JMJ entities raise nine issues on appeal. In issue four, they claim Sclafani Investments's commission agree-

---

4. Although Barton challenges, in one of his appellate issues, the trial court's order striking his third-party claims, he has waived his complaint by signing an order agreeing to the dismissal. *See* Tex.R.App. P. 33.1(a).

ment is unenforceable as a matter of law because it was not supported by sufficient consideration, and the trial court therefore erred in denying their motions for directed verdict and JNOV.[5] Our resolution of this issue is dispositive.

### Evidence of Brokerage Services

Over the course of the four-day trial, the jury heard testimony from Salvatore, Ed Brooks, and Barton concerning the Biltmore PUD project and the brokerage services provided by Salvatore that form the basis of the claim for a two-percent commission. Because our review of the issue related to Sclafani Investments's claim for breach of the Agreement requires that we consider the entire record, we recount specific testimony and evidence significant to our analysis. We begin with testimony from Salvatore.

### *Testimony of Salvatore Sclafani*

Salvatore testified he had known Barton for a number of years and they had a business relationship. He explained that as part of sharing office space with Barton, he would look out for developments or deals that would interest Barton. Salvatore further testified he had a "handshake deal" with Barton in which he would serve as COO of Barton's various business entities. As compensation, he would "participate in 10 percent of the profit" realized from "deals done by [JMJ Development]"

in which Salvatore "provided the administrative functions." [6] Salvatore described the COO position as an "administrative role," in which he "could represent [Barton's] company while [Barton] traveled to get additional business." Salvatore and Barton had no other agreement regarding compensation paid to Salvatore.

The March 2004 meeting he attended with Barton was the first time he met Brooks and learned about the Biltmore PUD project. Before that meeting, Salvatore had never discussed with Barton the possibility of looking at property in Nashville. This meeting was also the first time Salvatore learned Brooks had already presented the property to Barton. Salvatore testified that Barton's initial reaction was that the property "was not worthy of pursuing." Salvatore explained to Barton that he had experience in Nashville. After he discussed the property with Barton, Barton asked him to draft a letter of intent to purchase the property. Salvatore testified his recommendation to Barton that the deal was worth pursuing was gratuitous in connection with his ongoing relationship with Barton, stating "I didn't invoice him for my knowledge."

Salvatore testified he drafted the letter of intent using terms dictated by Barton and sent the letter to the Branstetter family upon Barton's approval. Salvatore explained that both drafting and sending the

---

**5.** They also challenge the judgment, claiming (1) the commission provision violates Tennessee law, (2) the evidence is legally insufficient to support the amount of damages awarded, and (3) the trial court erred in (a) excluding evidence regarding Sclafani Investments's knowledge about the legality of the agreement, (b) preventing Barton from making an offer of proof on the enforceability of the agreement, (c) failing to instruct the jury on past consideration, (d) awarding attorneys' fees to Sclafani Investments, and (e) striking Barton's third-party claims. By cross-appeal, Sclafani Investments argues the trial court

erred when it gave Barton and the JMJ entities excessive credits for payments made by certain settling defendants.

**6.** This "handshake deal" forms the basis of Sclafani Investments's breach of an employment contract claim. Sclafani Investments received this claim through assignment by Salvatore, who assigned "any and all claims and causes of action [he] may have by virtue of [his] employment with Timothy Barton...." The trial court directed a verdict against Sclafani Investments on this claim.

letter of intent were brokerage services he provided to Barton. Salvatore agreed, however, that at the time he drafted the letter of intent, he had no agreement with Barton regarding the payment of a commission for any brokerage services. He described the negotiations leading to the Agreement as "normal activity," consisting of telephone calls between the seller and buyer. Salvatore discussed with Barton what should be included in the Agreement, but he did not negotiate the terms. He testified Barton did his own negotiations, stating "[b]rokers don't negotiate the terms of the contract. They facilitate." Salvatore did not draft the Agreement.

Salvatore testified that after the Agreement was signed, he was through with his "broker hat." He explained that the services he performed on the project at that point were part of the "handshake deal" he had with Barton to participate in ten percent of the profit. Those services were performed in his capacity as COO. Salvatore clarified that nothing he did after the Agreement was signed constituted brokerage activities nor was he "required to provide any more brokerage services...." As part of his COO duties, Salvatore prepared a feasibility study and traveled to Tennessee to conduct due diligence. He also set up and arranged meetings related to bond financing and prepared a brochure to promote the development to prospective purchasers. The promotional brochure included a market analysis, as well as a financial analysis. During the due diligence phase, Salvatore stayed informed as to what type of work was being done on the project, including ongoing communications with various groups involved in developing the infrastructure. He also assisted Brooks and was involved in communications related to potential purchasers.

Salvatore testified that "[b]ringing a piece of property to Mr. Barton's attention is a brokerage activity" and that he, not Brooks, procured the Biltmore PUD opportunity for Barton. In fact, he claimed his brokerage fee was based upon the fact that he procured this opportunity for Barton. Salvatore further testified that the brokerage services that entitle him to receive a two-percent commission were (1) "provid[ing] input to [Barton] that influenced [Barton] to move forward"; (2) "recommend[ing] that [Barton] ... consider this property," which was "[b]ased on [Salvatore's] knowledge of the area"; and (3) drafting and sending the letter of intent. Salvatore could not recall anything else he did leading up to the execution of the May 2004 Agreement and agreed that by the time he signed the Agreement, he "had provided all the brokerage services [he was] going to provide." Although Salvatore added at one point in his testimony that after the Agreement was signed, he conferred with Barton on a "daily basis" and this "constant conversation with Mr. Barton concerning this transaction and further acquisition were brokerage services," he testified he could not recall a specific brokerage service he performed leading up to the first amendment in November 2004. When asked what he did to negotiate or procure the May 2005 contract closing the deal, Salvatore repeated that he "wrote the letter of intent and signed the [Agreement] a year earlier."

With regard to amending purchase and sale agreements, Salvatore testified that negotiating amendments is a brokerage activity. Yet here, he testified that although he was notified of the first amendment to the Agreement, he was not involved in the negotiations. Nor did he draft the amendment.

As to the commission provision in the Agreement, Salvatore testified it "compen-

sated [him] for [his] brokerage [services]"; the "10 percent compensated [his] company for the due diligence." He also testified that when he signed the Agreement and agreed to the broker commission, he was not giving up his rights under the handshake deal to receive ten percent of the profit. He testified that he "would defer to Mr. Barton" to explain why Barton provided for Sclafani Investments to receive the brokerage commission.

### Salvatore's Affidavit

Earlier in the lawsuit, Salvatore had signed an affidavit dated August 17, 2006, which was also admitted into evidence. In paragraph 6 of the affidavit, Salvatore stated:

> Based upon the information and my review of the data provided to BARTON and me at the [Spring 2004] meeting [with Brooks] as well as my familiarity of the locale of [the] subject tract, I recommended to BARTON that he consider making an offer for the property and he concurred. After BARTON and I met with Brooks, I, personally, drafted the letter of intent for BARTON/JMJ's attorney and their attorney's approval.

He also explained his familiarity with Tennessee real estate law, which "prohibits a real estate broker who is licensed in one state but not licensed in Tennessee from receiving a commission, if the broker conducts any of the negotiations in Tennessee for which the broker expects a commission."[7] Based on this statute, Salvatore stated he was "very careful" not to conduct any brokerage activities or perform any brokerage services in Tennessee.

Salvatore's affidavit confirmed he did not go to Nashville until after the Agreement was signed. When he went to Nashville, he conducted a due diligence investigation in his capacity as COO of JMJ Development. He stated that at the time he went to Tennessee, "all the activities of a real estate broker had been completed: the purchase price, escrow and payment terms had been negotiated and the contract of sale had been fully executed by all of the parties to it."

Salvatore also attested in the affidavit that he "devoted a considerable amount of [his] time, effort, energy, and professional experience" to assist in the purchase of the Biltmore PUD. He stated that in lieu of a salary for his time and expenses, he "agreed to accept the real estate commission" if the deal closed. He claimed in the affidavit that Barton and JMJ Development "knew or should have known that the services [he] rendered as a real estate broker were for payment of the commission" and it is the "standard method to pay a broker a commission for assisting in putting together this sort of transaction."

### Testimony of Ed Brooks

Brooks was first introduced to the Biltmore PUD through discussions he had with Axon West, the listing broker for the property. Brooks testified he knew Barton through business acquaintances, and following a "chance meeting" with Barton, he called Barton about the Biltmore property and set up a meeting. Brooks met with Barton and Salvatore in Dallas, where he presented a package of information. They discussed the opportunity that existed at the Biltmore PUD and went through drawings. Salvatore indicated he had experience in the Nashville area and thought he knew about previous attempts to develop the property. According to Brooks, Barton and Salvatore "thought it was an interesting project" and that at that meeting, Barton "immediately wanted to write a letter of intent without any further ado," adding "it was shocking."

---

7.  *See* Tenn.Code Ann. § 62–13–302 (2007).

Brooks testified he interfaced with Salvatore to facilitate the letter of intent and thought Salvatore was doing some administrative work in furtherance of the letter. Based on his dealings with JMJ Development, it did not appear to Brooks that Salvatore was an officer in the company. Brooks explained that although the letter of intent referenced a six-percent commission split, Barton agreed to "throw [in] another point." He assumed he would be sharing commissions with Salvatore, but he was never clear on whether Salvatore was being compensated as a co-broker on the deal or as COO of Barton's company.

After the Agreement was signed, there was a "flurry of activity" related to helping Barton perform the due diligence. During this time, Brooks worked on assignments from Barton and provided information to Barton and Salvatore. Brooks said it was "protocol" to copy Salvatore on communications related to the Biltmore PUD, describing Salvatore's role as "catching papers." Salvatore came to Nashville and they worked together on the due diligence.

Brooks testified that in late October 2004, "there was beginning to be tension" between Barton and Salvatore. He stated "there was friction. There were problems. There were delays." He described the seller's broker as "very upset" because the transaction was not going as well as it should have. Pursuant to the second amendment to the Agreement, Sclafani Investments was replaced by Adams. Brooks further testified that he never met Adams and Adams did nothing on this deal.

### Testimony of Timothy Barton

Barton testified that from time to time, he allowed brokers to use his office space rent free. He explained he did this because the brokers using his office space could bring him a deal or something else of interest. Barton testified it was Brooks who brought him the Biltmore PUD opportunity and presented the Biltmore PUD package at the March 2004 meeting. After seeing the entire presentation, Barton "was ready to sign it up." Although Salvatore attended the meeting with Barton, Barton had not talked with Salvatore about the project prior to the meeting.

Barton testified that Salvatore volunteered that he was in Tennessee ten years ago and that Salvatore had information about a Tennessee deal he worked on. The information was in storage. Because Barton had "known Sal a while," he asked Salvatore questions about what happened with his Tennessee deal. He also told Salvatore not to bother getting the information out of storage and that they had "everything we need to know right here." Barton testified he did not rely on Salvatore's recommendations in deciding to make an offer on the property.

Barton asked Salvatore to prepare the letter of intent. He testified Salvatore did not give him any advice or counsel as to the purchase price or material terms reflected in the letter of intent. It was drafted from Barton's computer form, and Barton instructed Salvatore as to what numbers to insert. Barton testified that aside from preparing the letter of intent, Salvatore did "[n]othing" to contribute to Barton's decision to sign the Agreement. Barton testified that before the Agreement was signed, he had no agreement with Salvatore regarding "whatever he did leading up to the contract on the Nashville property."

Barton agreed brokers are not required to perform due diligence to receive a broker's commission. He also agreed that the Agreement does not require Salvatore to do anything to close the deal once the Agreement was signed. Barton testified he put Sclafani Investments in the commission provision of the Agreement as "a

way to compensate Sal for doing that due diligence work." He explained "there is a certain amount of work that has to be done, and we were trying to be prudent. And if we were able to have that due diligence work done and have it paid through the brokerage fee, that's going to ... save us some money." Compensating Salvatore "for his due diligence work and the work to prepare and get everything ready so that [Barton and JMJ Development] could purchase the property," was the reason Barton agreed to contribute an additional one-percent commission. Under the terms of the Agreement, the sellers would pay six percent of the brokers' commission. Barton's company contributed an extra one percent and added Sclafani Investments "so we could take 1 percent away from those other brokers and use that money." When he put together the Agreement, he did not anticipate paying anyone else for the work that Salvatore was going to do or relying on Brooks for the due diligence work. If he had, he would not have agreed to pay Salvatore the additional one-percent commission.

Barton testified Salvatore went to Nashville and performed due diligence. "There was an accumulation of information that was put together, and Sal was involved in putting that together." One component in particular was the financial plan. Barton testified Salvatore's financial plan showed they were not going to make any money; "it was not a viable deal." Barton called Salvatore's work "[t]otally useless," explaining that it "didn't help at all. In fact, it hurt us."

Barton substituted Adams as the broker in the Agreement. He brought in Adams to perform due diligence and to prepare a financial analysis. He said Adams helped put together a "concise package" for investors to show a viable development plan.

Barton testified that "without [Adams's] work, [he] would have never closed."

## DISCUSSION

In their fourth issue, Barton and the JMJ entities maintain they are entitled to a take-nothing judgment as a matter of law on Sclafani Investments's claim for breach of the Agreement. Specifically, they complain the trial court erred in denying their motion for directed verdict or JNOV because the conduct that Sclafani Investments maintains was consideration for the two-percent commission fee—recommending that Barton purchase the property and preparing the letter of intent—occurred before the parties signed the Agreement. Because prior acts are not consideration for a current promise under Tennessee law, Barton and the JMJ entities argue there is no evidence of consideration by Sclafani Investments that would support the broker's fee.

### Standard of Review

We review challenges to a trial court's rulings on motions for directed verdict and JNOV under the same legal-sufficiency test applied to appellate no-evidence challenges. *City of Keller v. Wilson,* 168 S.W.3d 802, 822–23, 827 (Tex.2005); *Mauricio v. Castro,* 287 S.W.3d 476, 478–79 (Tex.App.-Dallas 2009, no pet.). In our legal sufficiency review, we consider the evidence in the light most favorable to the fact finding and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. If there is more than a scintilla of probative evidence supporting the finding, the legal sufficiency challenge fails. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.

2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). In contrast, evidence that is "so weak as to do no more than create a mere surmise or suspicion of its existence" is no more than a scintilla, and thus, no evidence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

A directed verdict for a defendant may be proper when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right to recover, or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000). Similarly, a judgment notwithstanding the verdict is proper when (1) the evidence is conclusive and one party is entitled to judgment as a matter of law, or (2) a legal principle precludes recovery. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

### Applicable Law

■ In reviewing the substantive contract law relevant to this issue, we apply Tennessee law, because it is the law governing the Agreement. Under Tennessee law, a valid, enforceable contract exists if it (1) results from a meeting of the minds of the parties in mutual assent to the terms; (2) is based upon sufficient consideration; (3) is free from fraud or undue influence; (4) is not against public policy; and (5) is sufficiently definite to be enforced. *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 524 (Tenn. 2005); *Doe v. HCA Health Servs. of Tenn.,*

*Inc.,* 46 S.W.3d 191, 196 (Tenn.2001). "Consideration exists when a party does something that he or she is under no legal obligation to do or refrains from doing something which he or she has a legal right to do." *Bratton v. Bratton,* 136 S.W.3d 595, 602 (Tenn.2004) (citing *Brown Oil Co. v. Johnson,* 689 S.W.2d 149, 151 (Tenn.1985)). Consideration is a bargained-for exchange that either confers a benefit upon the promisor or causes a detriment to or an obligation upon the promissee. *Id.; see also* RESTATEMENT (SECOND) OF CONTRACTS § 71(1981). Consideration is a required element to prevent the enforcement of gratuitous promises. *Guesthouse Int'l, LLC v. Shoney's N. Am. Corp.,* No. M2008–02567–COA–R3–CV, 2010 WL 987119, at \*18 (Tenn.Ct.App. Mar. 18, 2010). Past consideration—actions already taken before a promise is made—is insufficient to support a present or subsequent contract. *Bratton,* 136 S.W.3d at 604 (citing *Gilman v. Kibler,* 24 Tenn. (5 Hum.) 19, 1844 WL 1859, at \*3 (1844)).

■ In Tennessee, "[a]ll contracts in writing signed by the party to be bound . . . are prima facie evidence of a consideration." TENN.CODE ANN. § 47–50–103 (2010). The party asserting a lack of consideration bears the burden of overcoming this presumption. *Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 358 (Tenn.Ct. App.2001).

### Analysis

■ Barton and the JMJ entities contend they are entitled to a take-nothing judgment as a matter of law because the evidence established the consideration provided by Sclafani Investments was provided before a promise to pay the commission was made. As such, it was past consideration, which cannot support a current promise. We agree.

Sclafani Investments's claim for a two-percent commission on the Biltmore deal comes from paragraph 14 of the Agreement. Paragraph 14 contains no promise by Salvatore to perform certain services; nor does it outline the basic bargain among the parties. It simply contains promises by the seller to pay a brokerage commission equal to six percent and by the buyer to pay a brokerage commission equal to one percent, divided among the various brokers. If the deal does not close, no commission is owed.

The record before us reveals that the services Salvatore provided were separated into two categories: those he provided in his capacity as real estate broker and those he provided in his capacity as COO of Barton's company. This division of Salvatore's services comports not only with the breach of contract theories upon which Sclafani Investments sued—breach of a brokerage contract and breach of an employment contract—but also with the nuance in Tennessee law, which Salvatore explained prohibited him as an out-of-state broker from receiving a commission if he conducted negotiations in Tennessee for which he expected to receive a commission. *See* TENN.CODE ANN. § 62–13–302. Because of that nuance, Salvatore asserted he was "very careful not to conduct any activities, do any acts, or perform any services for which [he] expected to receive a commission as a real estate broker in Tennessee." And when he went to Tennessee, which was "[a]fter the contract was signed," he did so in his capacity as COO of Barton's company to conduct due diligence on the property. Salvatore testified unequivocally that at the point in time he went to Tennessee, "all the activities of a real estate broker had been completed."

For his brokerage services, Salvatore testified he (1) attended a meeting with Barton and provided input, which he says influenced Barton to move forward with an offer to purchase; (2) recommended to Barton that the property was worth pursuing and that Barton should consider the property; and (3) drafted and sent the letter of intent. These services were provided before Barton promised to pay a commission; Salvatore testified he had no agreement to receive a commission at the time he drafted the letter of intent. The promise to pay a commission occurred on May 21, 2004 when the parties signed the Agreement. As Salvatore testified, at the time he signed the Agreement, he "had provided all the brokerage services [he was] going to provide." Indeed, he emphasized that at such time, he was through with his "broker hat" and was "not required to provide any more brokerage services."

In his testimony regarding brokerage services, he also generally identified working on amendments to a contract and "constant conversation" with Barton as post-Agreement brokerage services. He admitted, however, that although he was notified of the first amendment to the agreement, he did not negotiate or draft the amendment. As well, he could not recall a specific brokerage service he performed leading up to the first amendment in November 2004. Rather, Salvatore consistently testified and attested to the fact that after the Agreement was signed, he performed services only in his capacity as COO.

Sclafani Investments relies on Salvatore's affidavit to suggest legally sufficient evidence exists to support the jury's finding that the commission agreement was supported by consideration. Salvatore states in his affidavit that before the Agreement was signed he (1) recommended Barton make an offer on the Biltmore PUD, and (2) drafted the letter of intent. He states that there were a "few

weeks of negotiations" before Barton's attorney finally presented an acceptable draft agreement, but he does not specify his participation or how he was otherwise involved in the negotiations. What Salvatore does say is that he did not perform any negotiations in Tennessee and that he was "very careful" not to do so because such conduct would have been prohibited under a Tennessee statute.

Salvatore also asserts in his affidavit that his "commission is an obligation that is typically paid by the Seller" and that Barton "knew or should have known" that the services he rendered "as a real estate broker" were for payment of the commission. Importantly, Salvatore never asserts in his affidavit that he and Barton agreed to a commission before he made his recommendation and drafted the letter of intent. Instead, he states he "discussed" his commission with Barton "both before and after the contract was signed." These statements do not contradict and are consistent with his trial testimony that he had no agreement to receive a commission before the services were rendered.

Tellingly, Sclafani Investments argues only that the affidavit presents evidence of sufficient consideration. It never responds to Barton and the JMJ entities' arguments that the consideration provided was past consideration and legally insufficient to support the subsequent promise to pay a commission. While Salvatore attested in his affidavit to the "considerable amount" of "time, effort, energy, and professional experience" he devoted to the Biltmore PUD transaction "both as real estate broker and as the Chief Operating Officer" and that "[i]nstead of receiving a salary for [his] time and expenses on the project, [he] agreed to accept the real estate commission," these statements do not identify how the services were divided. Further, the statements are not supported by any evidence that would show effort devoted to the broker services beyond that identified in his trial testimony. In fact, Salvatore testified that he "didn't invoice [Barton] for [his] knowledge"; his recommendation that the property was worth pursuing was gratuitous in connection with his ongoing relationship with Barton. Sclafani Investments points to no evidence that Salvatore's contribution of "time, effort, energy, and professional experience" as broker occurred after the Agreement was signed. Rather, the evidence establishes his brokerage "hat" was removed by that time; the services to which he testified were provided solely in his capacity as COO of JMJ Development.

Sclafani Investments further argues that Barton and the JMJ entities' trial theory was that there was a "gentlemen's agreement" between Salvatore and Barton that unless Salvatore performed the due diligence work to Barton's satisfaction, Sclafani Investments would not receive the commission as provided in the Agreement. Sclafani Investments maintains there was no such "side agreement" and that Salvatore was the "procuring cause" of the transaction with "extensive involvement" in the deal. This argument, however, is also contrary to the evidence. When asked why Barton would provide for Sclafani Investments to receive a brokerage commission, Salvatore testified that he would "defer" to Barton's explanation. Barton explained in his testimony that he added Sclafani Investments to the commission provision and agreed to include an additional one-percent commission to compensate Salvatore "for his due diligence work and the work to prepare and get everything ready so [they] could purchase the property."

Sclafani Investments finally argues that "the main consideration for the commission agreement is the broker procuring the

sales contract, and logically the same document can both contain and perform the agreement." But when asked what he did to procure or close the sale, Salvatore responded he "wrote the letter of intent and signed the [Agreement] a year earlier." Salvatore clearly testified that before he performed these services, he was under no contractual duty to do so. Even if a contract for the sale of property may also evidence an agreement to pay brokerage services, the agreement to pay a commission must still be based on sufficient consideration. Here, there is no evidence that Sclafani Investments had an agreement to receive a brokerage commission before Salvatore performed any of the services it claims Salvatore provided as consideration for the commission. Sclafani Investments does not offer, and we do not see, any evidence of brokerage services rendered after the signing of the promise to pay a commission.

We conclude the consideration provided by Sclafani Investments was past consideration. Therefore, the promise to pay a broker's commission to Sclafani Investments under the purchase and sale agreement is nothing more than a subsequent promise to pay for services already rendered. Under Tennessee law, performance that is completed before a promise is made will not support a current promise. *Bratton*, 136 S.W.3d at 604; *see also S.M. Williamson & Co. v. Ragsdale*, 170 Tenn. 439, 95 S.W.2d 922, 924 (1936); *Gilman*, 24 Tenn. (5 Hum.) 19, 1844 WL 1859, at *3; *see also Fleming v. Campbell*, 537 S.W.2d 118, 120 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.) (past consideration imposes no legal obligation to support subsequent promise). The jury in this case was not instructed on the definition of or law governing past consideration in the question asking if the Agreement was supported by sufficient consideration.

Because the only consideration provided by Sclafani Investments to support the promise to pay a commission was past consideration, we conclude there is legally insufficient evidence to support the jury's answer that the Agreement was supported by sufficient consideration. In the absence of valid consideration, Sclafani Investments has no claim for breach of the Agreement. Therefore, the trial court erred in denying Barton and the JMJ entities' motion for JNOV. We sustain their fourth issue.

Because our resolution of issue four is dispositive of the appeal, we do not address the remaining issues raised by Barton and the JMJ entities. TEX.R.APP. P. 47.1. We also do not reach the issue raised by Sclafani Investments in its cross-appeal. *Id.*

**CONCLUSION**

We reverse the trial court's judgment and render judgment that Sclafani Investments take nothing on its claims.